# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

FILED
KC
JAN 17 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

SHANTA MARTIN

MAGISTRATE JUDGE MASON

CRIMINAL COMPLAINT

CASE NUMBER: 08CR 0040

I, HOLLY BARRILE, being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __December 21, 2004__ in __Cook__ county, in the __Northern__ District of __Illinois__ defendant(s) did,

conspire with another to knowingly and intentionally distribute a controlled substance, namely, 50 grams or more of a mixture and substance containing cocaine base, in the form of crack cocaine, a Schedule II Narcotic Drug Controlled substance, in violation of Title 21 U.S.C. § 841(a)(1),

in violation of Title __21__ United States Code, Section(s) __846__.

I further state that I am a(n) Special Agent with the Federal Bureau of Investigation and that this complaint is
Official Title

based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof:   __X__ Yes   ____ No

_Holly Barrile_
Signature of Complainant

Sworn to before me and subscribed in my presence,

January 17, 2008                                     at         Chicago, Illinois
Date                                                                       City and State

MICHAEL T. MASON, U.S. MAGISTRATE JUDGE        _Michael T. Mason_
Name & Title of Judicial Officer                              Signature of Judicial Officer

State of Illinois        )
                         ) SS
County of Cook           )

# AFFIDAVIT

I, Holly Barrile, being first duly sworn on oath, depose and state as follows:

## Background of Affiant

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since 1996. In connection with my FBI duties, I investigate criminal violations of the federal narcotic laws, including but not limited to 21 U.S.C. §§ 841, 843, and 846. I also have received specialized training in the enforcement of laws concerning the activities of narcotic traffickers.

2. The information set forth in this Affidavit is based on my own participation in this investigation, my review of documents and reports related to this investigation, my review of audio and video recordings made during this investigation, information conveyed to me by other local, state, and federal law enforcement officers, and information provided by cooperating witnesses. Because this Affidavit is made for the limited purpose of establishing probable cause in support of the attached criminal complaint against SHANTA MARTIN ("MARTIN"), it does not contain everything that I or other law enforcement officers know about MARTIN or the events described herein.

## Information Provided by a Cooperating Witness

3. Some of the information contained in this Affidavit has been provided by a cooperating witness ("CW"). CW has assisted the FBI in ongoing criminal investigations in

1

exchange for money, and has been reimbursed for expenses. Information provided by CW has resulted in 10 arrests and the seizure of narcotics valued at over $270,000, including cocaine, heroin, and marijuana, and therefore the CW has proven reliable. The CW has a previous felony conviction for robbery. CW is an admitted high-ranking member of the Black P-Stone Nation street gang ("BPSN"). CW has identified MARTIN as an associate of Individual A, an admitted high-ranking BPSN member responsible for drug distribution and gang activity in an area on the South Side of Chicago controlled by the BPSN.

4. The information provided by the CW in this Affidavit has been corroborated by law enforcement officers whenever possible by, among other things, the use of electronic recording devices and physical surveillance. I have included my understanding of some of the words and phrases used in the recorded conversations set forth in the Affidavit. My understanding is based on the content and context of the conversations, information provided by the CW who participated in the recorded conversation, my training and experience, and the experience of other law enforcement officers.

### The December 21, 2004 Drug Transaction

5. On December 21, 2004, at approximately 1:50 p.m., at the direction and in the presence of agents, CW made a consensually-recorded phone call to Individual A. During that call, CW and Individual A agreed to meet at 839 West 50th Street, Chicago, Illinois for the purpose of conducting a narcotics transaction. After this call, agents searched CW's vehicle and person for weapons, contraband, drugs and excessive money; none was found. CW was equipped by agents with an audio and video recording device and given $2500 in pre-recorded government funds.

6. Then, followed by surveillance agents, CW drove to the area of 839 West 50th Street,

2

where the CW met with Individual A. At that location, Individual A told CW to follow him to a tire shop, which was located in the area of 51st Street and Ashland in Chicago, Illinois. CW, followed by agents, followed Individual A to the tire shop.

7. After arriving at the tire shop at approximately 2:39 p.m., Individual A told CW, "When we get back over there, we gotta drive that shit, go over there to the buildin'. You gon' have to sit in the car and keep your eye on me while I run in there and whip that shit up." [Individual A is telling the CW that after they're finished at the tire shop, they needed to drive to Individual A's building where Individual A would cook the cocaine into crack cocaine while the CW stayed outside to watch for the police.] According to the CW, and corroborated by video surveillance, MARTIN was also present at the tire shop. Agents have subsequently identified MARTIN from a driver's license photo.

8. Also at the tire shop, Individual A told CW that Individual A needed CW to purchase "a box of soda" [baking soda to assist in cooking the crack cocaine] and "some sandwich bags to put it in" [plastic bags for the crack cocaine]. Individual A also told CW that he would then come with "the work" [the crack cocaine] and "the scale" [to weigh the crack cocaine]. Individual A also told CW to meet him at Individual A's "momma's house" after CW obtained the sandwich bags and baking soda.

9. At approximately 2:54 p.m., CW departed the tire shop and, followed by agents, proceeded to a Dollar Store to purchase the baking soda and sandwich bags. After purchasing those items, CW, followed by agents, drove to the area of 839 West 50th Street, Chicago, Illinois, which, according to Individual A, is the location of his mother's house.

10. After meeting up with Individual A and MARTIN in the area of 839 West 50th Street,

3

CW followed Individual A and MARTIN to Individual A's building located at 820 W. 51st Place, Chicago, Illinois. At that location, CW met with Individual A and MARTIN. After seeing the sandwich bags that CW had purchased, Individual A said, "Damn, what the fuck. I need the little bittie ass [unintelligible] bags."

11. After that conversation, CW, followed by agents, drove back to the Dollar Store where CW said he exchanged the sandwich bags for different bags. Agents then followed CW back to Individual A's building, where he met with and gave the plastic bags to Individual A. CW then returned to his/her car and waited outside the building.

12. At approximately 4:00 p.m., CW entered the building and met with Individual A and MARTIN. During that meeting, Individual A told the CW, "I just cooked, she cooked, when we was cooking it I lost like a half ounce, an ounce." Individual A told the CW that he would cook more for the CW. MARTIN asked the CW, "Could you get it later?" Individual A and MARTIN together told the CW that they were busy and would repay the CW with an ounce and a half for the delay. The CW then began counting out the $2500 in pre-recorded funds. Individual A told the CW, "Give it to her." According to the CW, he/she then handed a portion of the money to MARTIN. MARTIN and Individual A examined the money to determine if any of it was counterfeit by holding up the bills and comparing them to each other.

13. Individual A told the CW about his "Mexican" source of supply. Individual A told the CW that his source of supply "fronts" him kilos of cocaine (meaning provides cocaine to Individual A on credit), and if Individual A doesn't like it he can take it back to the source. MARTIN then told the CW, "He [source of supply] knows every now and then there's a bad batch."

14. CW paid Individual A $2500 for the crack cocaine that Individual A and MARTIN

4

had cooked. Individual A then handed the CW a plastic bag containing a chunky, off-white substance. CW then left the building and, followed by agents, drove to a prearranged meeting location and turned over the suspected crack cocaine to agents. Agents again searched CW and his/her vehicle for weapons, contraband, drugs and excessive money; none was found.

15. The suspected crack cocaine was subsequently tested by the DEA laboratory, which concluded that the substance contained 90 grams of a chunky, off-white substance containing cocaine base.

16. I believe that the substance purchased from Individual A and MARTIN was cocaine base in the form of crack cocaine based on, among other things: (1) my experience as a law enforcement officer, including training on how crack cocaine is made; (2) Individual A's request that CW purchase baking soda for him to make the crack cocaine; and (3) a visual inspection of the off-white chunky substance.

17. Based on the foregoing, I respectfully submit that there exists probable cause to believe that SHANTA MARTIN conspired with Individual A to knowingly and intentionally distribute a controlled substance, namely, fifty grams or more of a mixture and substance containing cocaine base, in the form of "crack" cocaine, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846.

_____
HOLLY BARRILE
SPECIAL AGENT, FEDERAL BUREAU
OF INVESTIGATION

Sworn to and subscribed to before me on this 17th day of January 2008.

_____
MICHAEL T. MASON
UNITED STATES MAGISTRATE JUDGE